State v. Brooks.

## THE STATE v. CHARLES BROOKS.

1. On a trial for murder, it is not a sufficient objection to the panel of jurors served upon the prisoner, that it is not according to the statute. The particular objection should be pointed out.

2. A panel headed "petit jury, April term, 1863," containing the names of forty-eight jurors, and the names of the townships where they reside abbreviated, is sufficient, if served on the prisoner at the same time with the copy of the indictment, if the abbreviations are such as clearly to indicate the residences of the jurors. A cross over the name of one of the jurors will not vitiate the panel, if it leaves the name of such juror plainly legible.

3. A murder was committed on the 8th March, 1863. On the 30th of March, the prisoner confessed to G. H. and to the sheriff, that he did it. On the 2d of April, the defendant confessed the whole thing in writing before the justice. On the 15th April, he confessed the fact again to T. M., and on the 20th of April, again to T. R. A verdict of guilty being rendered, the court suspended judgment, and certified the case to this court for their advisory opinion, as to whether the Oyer should grant a new trial, on account of illegal admission of the said confessions.

4. *Held,* that even if the original confession were illegally admitted in evidence, because obtained by undue promises and threats, yet that the court would decline to advise a new trial, unless the subsequent confessions were specially objected to in the Oyer, on account of their having been obtained under the influence of the original promises or threats. The case not having any such special objections, this court

State v. Brooks.

will presume that the Oyer were satisfied, as a question of fact that the subsequent confessions were not produced by the influence of the original promises or threats. And upon a review of the facts, this court, seeing no reason to doubt the correctness of the admission of such subsequent confessions, will not advise a new trial.

On trial for murder at the Burlington Oyer and Terminer. Several question were reserved for consideration at bar, and were argued by

For the State, *M. Hutchinson.*

For the defendant, *J. C. Ten Eyck.*

The opinion of the court was delivered by

VREDENBURGH, J.    The defendant was convicted, at the last Burlington Oyer, for the murder, in the first degree, of one Job Brooks.    Sentence was suspended for the purpose of taking the advisory opinion of this court, whether there should be a new trial, on the following grounds :

First.    Because of an alleged defect in the list of jurors served upon the prisoner.

Secondly.    Because of alleged illegal admission of divers confessions of the defendant.

Waiving any question as to the regularity of the proceedings here, we will consider—

First, as to the list of jurors.    This list is on a half sheet of foolscap paper, and has on it only the following words: "Petit jury, April term, 1863.—Daniel F. Gibbs, Pemb.," followed by forty-seven other names, with like abbreviations for the names of the township.    The name of Joseph Taylor, one of the jurors, is crossed thus : "Joph ⋈ Taylor."

It is admitted that this list was served on the prisoner, at the same time with the copy of the indictment, within the proper time.    The cause was moved on the 28th of April, 1863, whereupon, on behalf of the defendant, it was objected that the list of jurors was not in accordance with the statute.

The statute, *Nix. Dig.* 197, § 1,* enacts, that in murder, the defendant shall have a copy of the indictment and a list

_____

*Rev., p. 279, § 66.

of the jury, mentioning the place of abode of such jurors, two entire days, at least, before the trial, and which jury, by the 8th section of the same act, is to be selected from the general panel drawn to attend at that term; and unless he has had such panel delivered to him, he shall not be put upon his trial without his consent in open court.

It is first objected to this panel, that it does not show, upon its face, in what county it is, nor in what court, nor in what case. But it was served at the same time with the copy of the indictment, in which all these things appear. There was no reason for repeating them upon what is only, by the statute, intended to be a mere list of the jury. In England, even for high treason, where the sheriff, by virtue of a general precept before a trial, or a commission of general jail delivery, returns a general panel, the same is entitled generally, "names of jurors to try for our Lord the king," without naming any of the prisoners. 1 *Chitty's Cr. Law.* 517.

It is next objected to this panel, that it does not appear that it was selected from the general panel, nor by whom. But it does appear that it was the petit jury for April term, 1863, from which we are to presume that no more than these forty-eight men were returned to that term as petit jurors, in which case there could be no selection. All that the sheriff or anybody else could do, was precisely what he has done, serve a copy of the whole list, and it is a matter not material by whom it was done. All the statute requires is that it shall be delivered by the sheriff, or other proper officer, to the prisoner, which it is admitted was done in the present case. It is next objected, that the statute requires forty-eight names on the panel, and it is alleged that there are only forty-seven on this, the name of Joseph Taylor having a cross over it. Why the cross was put there we are not informed. But it has not erased the name. The name is there yet, quite as legible as if the cross was not there. No objection was made at the trial. If there had been, it might have been explained. But whether objected to or not, we cannot say, against the evidence of our eyesight, that the

name is not there.  It is next objected, that the statute
requires that the panel should state the residences of the
jurors.  But, in the first place, no such objection was taken
at the trial, and so could not have injured the defendant on
the trial of the merits, and therefore by our statute, *Nix. Dig.*
205, paragraph 45, § 2,* is not ground for reversal even on
writ of error.  Next, the panel does state the names of the
townships by abbreviations.  The township residence of each
juror is stated in an abbreviated form.  No one could for a
moment hesitate to know, from these abbreviations, the resi-
dences of the jurors as perfectly as if the name of the town-
ship was written in full.  We think this panel does state the
residences of the jurors within the meaning of the act.  In
the case of *The King* v. *Stone*, 6 *Term R.* 531, in a trial for
treason, the objection was taken, that one of the jurors was ill
described, his place of abode being stated to be Grafton street,
there being several of that name.  The objection was over-
ruled.  The description in this case is more specific than that.
Even if these objections had been here specifically upon writ
of error, we see no reason to reverse therefor.

The second question reserved by the Oyer is, whether there
should be a new trial, because of the admission of certain con-
fessions of the defendant.

The murder was committed on the evening of the 8th of
March, 1863.

The first confessions of the defendant were made to George
Hulme, on the morning of the 30th of March, at Salem,
Ohio.  Mr. Hulme says, that with a constable of Ohio and
another person, on the morning of the 30th of March, 1863,
he arrested the defendant near Salem aforesaid, and imme-
diately put handcuffs on him.  The defendant asked them
what they wanted him for.  Hulme told him, to go back to
Jersey.  Hulme, the defendant, and the constable then got
in a carriage to return to Salem.  As they were riding along,
Mr. Hulme told the defendant that he was suspected of hav-
ing something to do with the murder of his father.  Defend--

*Rev., p. 284, § 89.*

State v. Brooks.

:ant replied, he had had a great deal of trouble. Hulme 'remarked to him it was very important, if he knew anything .about it, to tell it; that if he did know anything about it, :the only safe course for him was to tell the truth. The truth was the only thing that would carry him through, and :give him friends here and in the world to come; that lies would not. Hulme says: I said everything I could to get him to tell the truth, and all he knew about it. I used no threats or promises. I told him to tell the truth, and I would do all I could for him. I kept telling him it was believed there were others that knew as much as he did, if not more. Mr. Hulme then proceeds further, and says; "Just before we got into Salem, I remarked, Charley, if you have :anything to say, say it before we get into Salem." He hesitated a moment, and then says: Mr. Hulme, I'll tell you all about it. "I'm the boy that done it; I struck the first blow; I struck him but once, but Tim finished him." The defend-.ant then went on, and gave a detail of the transaction, which it is needless to recapitulate now.

The defendant made substantially the same statement to sheriff Leeds, on the same day, while in the cars returning to New Jersey. On the 2d of April, 1863, the defendant's examination was taken in writing before Ellsworth Holman, .a justice of the peace, and to which he signed his name. The justice previously said to him: Charles, you are charged with the murder of your father; if you have anything to :say in relation to the murder, I will hear it. The justice :also said to him, that he wished him to understand, that he was not required to state what he knew respecting it, especially if it would criminate himself. The justice says: I cautioned him on that point, lest it should come against him at :some future time. I also said, what he might say must be voluntary, of his own free will. I think George Hulme was present during the whole examination. In this written examination, the defendant makes the same confessions, in :substance, that he had previously to Mr. Hulme and the :sheriff.

On the 15th of April, 1863, the defendant told Thomas McNevinney the same story that he had done to Hulme, confessing that he did it, and stating divers circumstances attending the transaction.

On the 20th of April, 1863, the defendant told one Thomas Runos that he had done the deed himself. Here the defendant has, as often as five times, on as many different occasions, to as many different people, confessed that he committed this murder. They are *prima facie* admissible, unless the defence shows something to make them inadmissible.

It is contended here, on the part of the defence, that they are all inadmissible, on account of having been procured by undue promises and threats.

It is not pretended that any undue promises or threats, or any promises or threats, or undue influences whatever, were used at the time of the confessions before the justice, to McNevinney or to Runos. But it is contended that Mr. Hulme, to whom the first confession was made, did promise him to befriend him if he would tell the truth, and that such confession was untruly made in consequence of such promise; and that the same promise induced him to persevere in the same statements subsequently before the justice and McNevinney and Runos.

I shall first examine whether the confessions before the justice and to McNevinney and Runos were properly admitted by the court. Sitting here to give an advisory opinion to the Oyer, not upon specific questions of law, but as to the propriety of a new trial, can we say that the court below should have overruled this testimony?

On the trial, the written confession and the one to McNevinney were objected to, but the case does not show upon what ground they were objected to. They were *prima facie* admissible, and to make the objection a legal one, it should have been, that the previous confessions were obtained by undue promises or threats, and that the confessions objected to were obtained by the continuing influence upon the prisoner's mind of such threats or promises. If

such an objection had been taken, the state might have shown the contrary thereof; a general objection was not sufficient. The reason of the objection should have been specially shown. But suppose this objection had been specially made, what was the question, in this regard, before the Oyer? It was not whether the confessions to Hulme and the sheriff were obtained by undue promises, but whether the facts in evidence overcame the presumption that the confessions to the justice, McNevinney, and Runos were likewise made, by the continuing influence upon the defendant's mind of those promises. These were questions of fact for the Oyer to settle, and they did settle them. They decided, if the question was raised at all, that in their opinion the confessions to the justice and to McNevinney and Runos were not obtained by the continuing operation upon the defendant's mind, of the supposed promises by Hulme. Can we say that the Oyer was wrong in that decision?

It does not appear, by the case, that this question was raised before the Oyer, and if it was not, the evidence was clearly admissible. But if this question was raised before the Oyer, it was decided by that court that these confessions to the justice, to McNevinney, and Runos were not produced by the supposed inducements held out by Mr. Hulme. Can we say that the Oyer was wrong in this decision?

In the case of *The State* v. *Guild*, 5 *Halst.* 180, the Oyer overruled the original confessions, upon the ground that they had been induced by promises, but let in subsequent confessions, upon the ground that the Oyer concluded, from the circumstances, that the hopes induced by the original promises were dispelled. In the charge to that jury, Justice Drake said: "Although an original confession may have been obtained by improper means, subsequent confessions of the same, or of like facts, may be admitted, if the court believes, from the length of time intervening, from proper warning of the consequences of confessions, or from other circumstances, that the delusive hopes or fears, under the influence of which the original confessions were obtained, were entirely dispelled."

The question was reviewed, and the proceedings and charge of Justice Drake received the entire approval of this court. It was thus a question of fact, whether in the case before us, the confessions to the justice, to McNevinny, and to Runos were induced by the promises made by Hulme to be settled by the Oyer. We could not reverse their decisions upon this point without also constituting ourselves a tribunal to decide facts, and we are not in as favorable position to decide rightly as the Oyer. But we do not see in the present case the slightest ground to doubt the correctness of the result to which the Oyer arrived, even if the objection had been specially taken. Take the case of the written confession to the justice. It took place on the 2d of April, three days after the confession to Mr. Hulme. He was cautioned by the justice that he was not required to state what he knew respecting the murder, especially if it would criminate himself, lest it should come against him at some future time, and what he should say must be voluntary. No threats or promises whatever were made use of. Now why should the Oyer conclude, that what the defendant should then say, would be the result of what Hulme had said to him three days before? He was told that he was not required to state anything, and what he should state must be voluntary. He however saw fit to go on, and make his written confession.

In what way does the confession to the justice differ from a plea of guilty before the Oyer? If this confession should be refused, for the same reason the Oyer should have refused a plea of guilty, upon the ground, that having once been induced to accuse himself, the plea of guilty is presumed to be made under the same motives.

I see no ground whatever to conclude that this entire written confession was induced by any promise by Hulme or the sheriff. These kinds of confessions are continually received; they were in the case, before referred to, of Guild. So also in *Williams' case*, 1 *City Hall Recorder* 149; and of others, 4 *City Hall Recorder* 138,* and of *Mills*, 5 *City Hall Recorder* 78. This written confession contains many details showing

* Case of *Bevorhan et al.*

State v. Brooks.

internal evidence of its truth,—details proved by other witnesses.

But again, the defendant confessed to McNevinny, on the 15th April, seventeen days after his confession to Hulme. What reason had the Oyer to believe that this was induced by what he had been told by Hulme? I see nothing in the evidence which should have induced the Oyer to believe that this was the consequence of what Hulme had said to him, and so with regard to the confession to Runos so late as the 20th of April.

As to the evidence of Runos, no objection to its admission was made at all. The confession to him was full and complete that he did the deed. Upon the confessions to Runos alone the court would be unwilling to advise a new trial.

It appears to me that, if the Oyer were bound to reject these confessions because of the conversation between Hulme and the defendant on the 30th of March, the Oyer should have rejected, for the same reason, his plea of guilty, if he had made one in open court.

It has been a question whether the decision of the admissibility of these confessions was one for the court or the jury. But it is now settled that it is one for the court. The court weighs the evidence upon this point, and admits or rejects the evidence in its discretion. What weight the jury are to give it, is another matter. This makes it necessary to decide whether the Oyer should have rejected the confessions to the sheriff and Mr. Hulme. The written confessions are better evidence than the verbal ones to Hulme, and they being admissible, it is a matter of indifference whether those to Hulme and the sheriff are in evidence or not. The evidence of the written confession and to McNevinny and Runos must have produced a conviction whether the confessions to Hulme were in evidence or not.

The question being one of discretion, this court sees no reason to recommend a new trial, when it is apparent that it could only result, as this one has, in a verdict of guilty.

The court decline to advise the Oyer to give a new trial.